

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-16-2009

# USA v. Bilial Shabazz

Precedential or Non-Precedential: Precedential

Docket No. 08-2145

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"USA v. Bilial Shabazz" (2009). *2009 Decisions.* Paper 1439.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1439

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 08-2145

UNITED STATES OF AMERICA

v.

BILIAL SHABAZZ,

Appellant

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal Action No. 2-06-cr-00710-1)
District Judge: Honorable Eduardo C. Robreno

Submitted Under Third Circuit LAR 34.1(a)
March 24, 2009

Before: RENDELL, AMBRO, and JORDAN, Circuit Judges

(Opinion filed: April 16, 2009)

Mark S. Greenberg, Esquire
Lacheen, Wittles & Greenberg
1429 Walnut Street, Suite 1301
Philadelphia, PA   19102-0000

      Counsel for Appellant

Laurie Magid
   Acting U.S. Attorney
Robert A. Zauzmer
   Assistant U.S. Attorney, Chief of Appeals
Karen S. Marston, Esquire
   Assistant U.S. Attorney
Office of the United States Attorney
615 Chestnut Street, Suit 1250
Philadelphia, PA   19106-0000

      Counsel for Appellee

------

OPINION OF THE COURT

------

AMBRO, Circuit Judge

A jury found Bilial Shabazz guilty of one count of conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C § 1951(a), one count of Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a), and one count of using a firearm during or in relation to a crime of violence, in violation of 18 U.S.C § 924(c).  Shabazz was sentenced to a total of 360 months'

2

imprisonment. He now challenges his conviction and sentence.[1] We affirm both.

## I. Facts and Procedural History

A grand jury in the Eastern District of Pennsylvania returned a three-count indictment against Shabazz, Christopher Young, Steven Patton and Bruce Johnson, all in connection with the December 3, 2006 robbery of a Wal-Mart at Roosevelt Boulevard in Philadelphia. Patton, Johnson and Young each pled guilty, while Shabazz went to trial.

The robbery was planned by Patton, an assistant manager at the Roosevelt Boulevard Wal-Mart, and Johnson, who had previously worked with Patton at that store, but at the time was an assistant manager at a Wal-Mart in Cherry Hill, New Jersey. They chose to target the Roosevelt Boulevard store because they knew that, during the holiday-shopping season, the store would have large amounts of cash in its safe. According to both Patton and Johnson, Johnson recruited his brother-in-law, Shabazz, to carry out the robbery, and Shabazz later recruited Young. Patton claimed that he first met Shabazz at a McDonald's near the Roosevelt Boulevard store shortly before the robbery, where Johnson, Shabazz and Patton met to complete the plan. According to Patton, they decided that Patton would let Shabazz and his accomplice into the store around 2:00 a.m., when most of the overnight employees would be out on their lunch break,

---

[1] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 18 U.S.C. § 3742(a) and 20 U.S.C. § 1291.

and that Patton would be taken to the safe room and tied up to make it look like he was a victim of the robbery.

At approximately 2:15 a.m. on December 3, Patton let two men into the store, whom he later identified as Shabazz and Young. As Patton led them to the safe room, they encountered Richard Tate, a store employee, who had come to the front register to ask Patton to cash him out. The two robbers then led Patton and Tate to the safe room at gunpoint. Once there, Patton was ordered to open the safe, while Tate was ordered to lie on the floor face down and then was bound with duct tape. After the safe was opened, Patton was also ordered to the floor and his hands were duct-taped. The two robbers left the store with approximately $351,563 in cash.

Patton then freed both himself and Tate and called the police. Initially, Patton presented himself as a victim of the robbery. After viewing the surveillance video, which showed him opening the store's door to allow the two men in, Patton admitted his involvement in the crime. He directed the police to Johnson, who in turn implicated Shabazz and Young. On February 1, 2007, Shabazz was arrested in Miami, Florida. While he was being processed at the Miami-Dade County Jail, Detective Wayne McCarthy found $2,400 in cash in Shabazz's wallet and remarked: "That's a lot more money than I carry around in my pocket." Shabazz allegedly replied: "Well, there's plenty more where that came from."

In March 2007, Shabazz filed a pretrial motion to have that comment suppressed on the ground that no *Miranda* warning had been issued prior to Detective McCarthy's initiating a conversation with him about the amount of money in

4

his wallet.  The District Court denied the motion, holding that the statement was not the product of a custodial interrogation.

Shabazz's trial began on August 14, 2007.  Patton testified about planning the robbery with Johnson and Shabazz, and about Shabazz's alleged actions in carrying it out.  During his testimony, the Government introduced footage of the robbery from the store's surveillance cameras, which Patton narrated over Shabazz's objection.  The footage showed the man Patton identified as Shabazz walking toward the store from the parking lot, entering the store, grabbing Tate by the store register and putting a gun to his neck, shoving Tate to the ground in the safe room and putting a gun to his head, taking money from the safe and putting it in a trash bag and his clothing, and leaving the safe room with the money.  In addition, Patton identified (also over objection) Shabazz as the man holding a gun in a still picture taken from the robbery.

Johnson testified about coming up with the idea for the robbery with Patton and then recruiting Shabazz to execute it.  Johnson described receiving multiple phone calls from Shabazz on the day of the robbery, including one shortly before it took place, during which Shabazz allegedly informed Johnson that he (Shabazz) was just outside the store and ready to be let in by Patton.  Johnson also testified that he spoke with Shabazz twice after the robbery and that, just before he was arrested, he made plans to meet Shabazz at a Philadelphia gas station to discuss dividing up the proceeds.

The Government also called Tate to the stand.  He testified that the robbery had left him "discombobulated," that he did not want further involvement in the matter, and that he

5

was only testifying because he had been served with a subpoena. He described being shown two different photo arrays by investigating officers. He explained that he was unable to identify anyone in the first array, but that he circled Shabazz's photograph in the second, though when he did so he was not quite sure "if that was the person." Detective James Severa, who showed Tate the second array, testified that Tate identified Shabazz's photograph without hesitation.

Detective McCarthy testified that Shabazz had $2,400 in cash on him when he was processed at the Miami-Dade County Jail, and that, after Detective McCarthy made the remark about the money, Shabazz commented that "there's plenty more where that came from."

The Government also called Ronneka Surreal Rankin, a woman with whom Shabazz spent time while he was in Miami. She testified that, during their relationship, Shabazz asked her approximately five times to retrieve wire transfers sent to him from Philadelphia, each ranging between $1,000 and $5,000.

Finally, the Government introduced cell phone records that showed numerous calls between Shabazz's cell phone number and Johnson's in the days before and after the robbery. One call, which had been made from Shabazz's phone to Johnson's just prior to the robbery, was traced to a cell phone tower near the Roosevelt Boulevard store.

The jury began its deliberations at approximately 12:25 p.m. on August 17. Just over an hour later, the jury sent a note to the District Judge with six requests, including a request to read the transcript of Tate's testimony. The Judge denied that

request, following an objection by the Government.  The other five requests were granted,[2] and at 2:50 p.m. the jury was sent back to continue its deliberations.  Twenty-five minutes later, the Judge informed the jury that he had changed his position with regard to the reading back of Tate's testimony and gave it the option of obtaining that testimony.  Two minutes later, the jury sent a note to the Judge indicating that it was withdrawing its initial request.  At 3:39 p.m., the Court reconvened, having been informed that the jury had reached a verdict.  The jury found Shabazz guilty on all three counts.

Shabazz's presentence report gave him a Sentencing Guidelines range of between 360 months to life.  The basis for this recommendation was § 4B1.1(c) of the Sentencing Guidelines, which provides a recommended range of at least 360 months to life for any career offender convicted under 18 U.S.C § 924(c) (use of a firearm during or in relation to a crime of violence) who is not eligible for an acceptance-of-responsibility reduction.  U.S.S.G. § 4B1.1(c)(2)(B) & (c)(3).  Shabazz objected to the recommendation, arguing that it exceeded the statutory maximum for the firearm conviction.  The District Court rejected the challenge, and, on April 16, 2008, imposed a sentence of 360 months' imprisonment.  Shabazz timely appealed.

---

[2] Those other requests were for the elements of the three counts, the Wal-Mart surveillance video, the activity summary on the phone linked to Shabazz, a letter Shabazz wrote to Rankin after being apprehended in Miami, and the photo arrays shown to Tate.

## II. Discussion

Shabazz makes four arguments on appeal: (1) the jury's request to read back Tate's testimony should have been granted when it was initially made; (2) Detective McCarthy's testimony about what Shabazz allegedly said while being processed in Miami should have been suppressed; (3) Patton should not have be allowed to identify Shabazz in the surveillance video footage and the still photo introduced during his testimony; and (4) his sentence exceeded the statutory maximum for the firearms conviction on which it was based.

### A. The Jury's Request for Tate's Testimony

Shabazz asserts that the District Court erred in initially denying the jury's request to read back Tate's testimony.[3] We agree that the jury was entitled to have access to the testimony. While "[a] trial court has broad discretion in deciding whether to accede to a jury's request for a reading of testimony[,]" we have required that the denial of such a request be grounded in either concerns about slowing down the trial or concerns about causing the jury to place undue emphasis on the requested portion of the trial transcript. *United States v. Zarintash*, 736 F.2d 66, 69–70 (3d Cir. 1984); *see also United States v. Bertoli*, 40 F.3d 1384, 1400 (3d Cir. 1994). Neither of those worries was implicated here. According to the District Court's own estimation, Tate's testimony ran no longer than 25 minutes.

---

[3] We review for abuse of discretion a district court's denial of a request for a reading of testimony. *United States v. Zarintash*, 736 F.2d 66, 69–70 (3d Cir. 1984).

And, as Shabazz notes, Tate's testimony was not peripheral, as Tate was both the only witness to link Shabazz directly to the robbery who was not testifying in connection with a plea agreement and the only one who expressed some uncertainty about his identification. *See United States v. Rabb*, 453 F.2d 1012, 1014 (3d Cir. 1971) (explaining that concerns are misplaced that the jury will put undue influence on the portions of the transcript the jury asked to read back when the testimony requested is "crucial to [the] determination of . . . guilt or innocence"). Thus, we concur with the District Court's reconsidered determination that the jury's request to read back Tate's testimony should have been granted.

As might be guessed, however, any such error was cured when the Court reversed itself and gave the jury the option of reading Tate's testimony. Shabazz contends that this reversal "was too little[,] too late." Shabazz's Br. 17. We disagree. The Court ultimately gave the jury what it requested—access to Tate's testimony. It is true that the jury reached its verdict not long after it informed the Court that it no longer wished to consult Tate's testimony. But that does not change that it had the opportunity, prior to reaching that verdict, to determine whether reading Tate's testimony would aid its deliberations. In this context, the harm, if any, caused by the District Court's initial denial of the jury's request was undone by its subsequent and prompt reversal.

## B. Shabazz's Statement to Detective McCarthy

Shabazz next argues that the statement he allegedly made to Detective McCarthy about having "plenty more" cash than the $2,400 found in his wallet should have been suppressed, as

9

it was the product of a custodial interrogation and Shabazz had not yet been advised of his *Miranda* rights.[4] *See Miranda v. Arizona*, 384 U.S. 436, 477–79 (1966) (providing that statements obtained during a custodial interrogation are inadmissible under the Fifth Amendment of our Constitution if the defendant was not informed both of the right to counsel and the right to remain silent).  The District Court held that, while Shabazz was certainly in custody when he had the exchange with Detective McCarthy about the money in his wallet, that exchange did not amount to an interrogation, as (according to the District Court) "the statement [in question] was made while bantering or in casual conversation with an agent with compulsion not being included."  Shabazz argues that the exchange constituted the "functional equivalent" of an interrogation because Detective McCarthy's comment about the amount of money Shabazz was carrying around with him was "reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

It is unnecessary to reach the issue of whether Shabazz's statement was the product of a custodial interrogation.  That is because, even were we to conclude that the District Court erred in admitting the statement, Shabazz would still not be entitled to a new trial.  The admission of unconstitutionally obtained

---

[4] We review a denial of a motion to suppress "for clear error as to the underlying facts, but exercise plenary review as to its legality in light of the [C]ourt's properly found facts." *United States v. Lafferty*, 503 F.3d 293, 298 (3d Cir. 2007) (quoting *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003)).

10

evidence does not warrant reversing a conviction where "the prosecution can show that the evidence is so overwhelming that it is beyond a reasonable doubt that the verdict would have been the same without the improper evidence." *United States v. Price*, 13 F.3d 711, 720 (3d Cir. 1994) (citation and internal quotation marks omitted).

That standard is easily met here. Shabazz's alleged admission to Detective McCarthy played only a minor role in the Government's case, essentially reinforcing Rankin's testimony that Shabazz had access to a lot of money while he was in Miami. The heart of the Government's case was the testimony of Patton, Johnson and Tate, the footage from the surveillance video, and the cell phone records linking Shabazz's phone to Johnson's (including one call from the area of the Roosevelt Boulevard Wal-Mart just prior to the robbery). That evidence overwhelmingly pointed to Shabazz's guilt. Thus, any error flowing from the denial of the suppression motion and the admission of Detective McCarthy's testimony was harmless.

## C. Patton's Identification Testimony

Shabazz also argues that the District Court erred in allowing Patton to identify him as the man depicted in both the surveillance video of the robbery and a still photo taken from that video.[5] Shabazz contends that, because he was present in

---

[5] We review a district court's "decision to admit or exclude evidence for abuse of discretion." *United States v. Bobb*, 471 F.3d 491, 497 (3d Cir. 2006). "However, to the extent the District Court's admission of evidence was based on

11

the courtroom, the jury was capable of determining for itself whether he was the man in the surveillance footage and the still photo. Therefore, he argues, Patton's identification testimony was inadmissible under Federal Rule of Evidence 701, which permits a lay witness to testify in the form of "opinions or inferences" only when such testimony is both "rationally based on the perception of the witness," and "*helpful to . . . the determination of a fact in issue*."[6]  Fed. R. Evid. 701 (emphasis added).

This concern that Patton's testimony drew inferences that were properly the jury's to make is misplaced.  Patton testified as a fact witness, not as a witness providing opinions and inferences of the type that potentially encroach on the province of the jury.  To be sure, the distinction between fact testimony (on the one hand) and opinions and inferences (on the other) is not one that can be drawn with surgical precision.  *See* 3

---

an interpretation of the Federal Rules of Evidence, the standard of review is plenary."  *Id.*  The Government contends that Shabazz never objected to Patton being allowed to narrate the footage from the surveillance video, and thus that the District Court's decision to allow that testimony should be reviewed for plain error.  Gov't's Br. 40.  The record does not support the Government's contention, however, and we will review for abuse of discretion.

[6] In addition, the testimony must genuinely be lay testimony, "not based on scientific, technical, or other specialized knowledge within the scope of [Federal] Rule [of Evidence] 702."  Fed. R. Evid. 701.

Christopher B. Mueller and Laird C. Kirkpatrick, Federal Evidence § 7:1 (3d ed. 2007), at 747 ("All testimony necessarily reflects not only facts that the witness saw, but also opinions or inferences in the form of recollection, evaluation, and thoughts about what he saw."). Nonetheless, in the identification context at least, Rule 701 is typically applied where a witness is asked to identify the defendant in an incriminating photo or video based simply on *general familiarity* with the defendant's appearance. *See, e.g.*, *United States v. Dixon*, 413 F.3d 540, 544–46 (6th Cir. 2005); *United States v. Pierce*, 136 F.3d 770, 773–75 (11th Cir. 1998); *United States v. Jackman*, 48 F.3d 1, 4–6 (1st Cir. 1995); *United States v. LaPierre*, 998 F.2d 1460, 1465 (9th Cir. 1993); *United States v. Towns*, 913 F.2d 434, 445 (7th Cir. 1990); *United States v. Allen*, 787 F.2d 933, 935–36 (4th Cir. 1986), *vacated on other grounds*, 479 U.S. 1077 (1987).

Yet that is not what occurred here. Patton identified Shabazz in images taken from a surveillance video of events *in which Patton himself took part*. Indeed, the District Court expressly limited Patton's narration of the video to those incidents to which Patton was an eyewitness, excluding him from discussing what was happening in those portions of the video that depicted actions to which Patton's back was turned at the time. Accordingly, Patton's testimony was admissible as ordinary fact testimony.

13

### D. Shabazz's Sentence

Finally, Shabazz challenges his sentence.[7]   Although Shabazz was convicted for three separate offenses, because of his status as a career offender under § 4B.1 of the Sentencing Guidelines, the Guidelines range of 360 months to life imprisonment was based just on his § 924(c) conviction (use of a firearm during or in relation to a crime of violence).[8] Shabazz's sentence of 360 months' imprisonment was therefore at the lowest end of the applicable Guidelines range.

---

[7]As Shabazz is asking us to review the District Court's legal conclusion that 18 U.S.C § 924(c) carries a maximum sentence of life imprisonment, our review is plenary. *United States v. Hoffecker*, 530 F.3d 137, 153 (3d Cir. 2008).

[8] Under § 4B1.1(c)(2), when a defendant is convicted of multiple counts, including at least one conviction for either 18 U.S.C. § 924(c) or § 929(a), the Guidelines range is the greater of either "(A) the [G]uideline range that results by adding the mandatory minimum consecutive penalty required by the 18 U.S.C. § 924(c) or § 929(a) count(s) to the minimum and the maximum of the otherwise applicable [G]uideline range determined for the count(s) of conviction other than the 18 U.S.C. § 924(c) or § 929(a) count(s)," or "(B) the [G]uideline range determined using the table in subsection (c)(3)." U.S.S.G. § 4B1.1(c)(2)(A)–(B).  Under the table found at § 4B1.1(c)(3), the Guidelines range where there is no reduction for acceptance of responsibility is 360 months to life imprisonment, which, in Shabazz's case, is greater than the range as calculated under § 4B1.1(c)(2)(A).

Shabazz appears to want to challenge his sentence on the basis of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), which held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. He argues that, because he was sentenced specifically under § 924(c)(1)(A)(ii) (which applies when a gun is brandished in connection with a crime of violence), and because the issue of whether he actually brandished the gun was not presented to the jury, his sentence was improper under *Apprendi*.

This argument misses the mark. Shabazz's suggested range under § 4B.1 of the Sentencing Guidelines was based on a generic § 924(c) conviction, not a conviction for specifically brandishing a gun in connection with a crime of violence. *See* U.S.S.G. § 4B1.1(c)(2)(B) & (c)(3). Moreover, even if that were not the case, the effect of the finding that Shabazz brandished a gun during the robbery was, as noted in further detail below, to alter the statutory minimum for the offense, not the statutory maximum. *See Harris v. United States*, 536 U.S. 545, 554 (2002).[9] As such, the Supreme Court has held that § 924(c)(1)(A) treats brandishing "as [a] sentencing factor[. . .] to be found by the judge, not [an] offense element[. . .] to be found by the jury." *Id.* at 556. Thus, this challenge fails.

---

[9] Shabazz describes *Harris* as a "plurality decision." Shabazz's Br. 25. However, the portion of *Harris* relevant to whether the brandishing finding increased the statutory maximum for Shabazz's offense—Part II—was joined by a majority of the Court.

Shabazz is better seen not as making an *Apprendi* argument, but as simply challenging his suggested Guidelines range of 360 months to life imprisonment on the ground that a § 924(c) conviction does not carry a statutory maximum of life imprisonment.[10]   The relevant portion of § 924(c)—§ 924(c)(1)(A)—does not contain an express statutory maximum.   Rather, it provides different statutory minimums depending on whether the gun was merely carried (five years), brandished (seven years), or discharged (ten years). 18 U.S.C § 924(c)(1)(A)(i)–(iii).  *Harris* did not settle the issue of the statutory maximum for a § 924(c)(1)(A) conviction, though the majority did note that "[s]ince [§ 924(c)(1)(A)'s] subsections alter only the minimum, the judge may impose a sentence *well in excess of seven years*, whether or not the defendant brandished the firearm."  536 U.S. at 554 (emphasis added).  This conclusion was echoed by the dissent, which, in supporting its position that a finding that the defendant brandished a firearm must be made by a jury, explained that such a finding changes the "penalty range for a conviction" under § 924(c)(1)(A) from "five years to life in prison" to "seven years to life imprisonment."  *Id.* at 575–76 (Thomas, J., dissenting).

The Court of Appeals for the Fifth Circuit has held that, in setting out a statutory minimum, but not a statutory maximum, "Congress . . . implicitly authorized district courts to

_____

[10] At the District Court, Shabazz objected to the presentence investigation report's designation of life imprisonment as the statutory maximum for his § 924(c) conviction.  This issue was thus preserved.

16

impose sentences under § 924(c)(1)(A)(ii) in excess of seven years and up to a maximum of life imprisonment." *United States v. Sias*, 227 F.3d 244, 246 (5th Cir. 2000). Every other Court of Appeals to address the issue directly has come to this same conclusion.[11] *See United States v. Johnson*, 507 F.3d 793, 798 (2d Cir. 2007); *United States v. Dare*, 425 F.3d 634, 642 (9th Cir. 2005); *United States v. Avery*, 295 F.3d 1158, 1170 (10th Cir. 2002); *United States v. Cristobal*, 293 F.3d 134, 147 (4th Cir. 2002); *United States v. Sandoval*, 241 F.3d 549, 551

---

[11] Shabazz cites one case, *United States v. Jones*, 418 F.3d 726 (7th Cir. 2005), that appears to depart from this consensus. There, the Court noted, with respect to a defendant convicted of both § 924(c)(1)(A)(iii) (discharging a gun in connection with a crime of violence) and 18 U.S.C. § 2113(a) (bank robbery), that "the jury's verdict authorized the judge to impose any sentence *up to the maximum of twenty years in prison*." *Jones*, 418 F.3d at 732 (emphasis added). But, to the extent the Court implied that the maximum sentence for a § 924(c)(1)(A) conviction is twenty years, it did so in a *dictum*. The issue addressed in *Jones* was the same one addressed in *Harris*—whether a fact that alters the statutory minimum for an offense must be found by a jury. *See Jones*, 418 F.3d 730–32. It was not the one we are addressing here—the statutory maximum for a § 924(c)(1)(A) conviction. On that issue, the Court of Appeals for the Seventh Circuit's answer can be found in *United States v. Sandoval*, 241 F.3d 549 (7th Cir. 2001), where it held that "convictions under § 924(c)(1)(A) carry a statutory maximum sentence of life imprisonment." *Id.* at 549. As such, *Jones* provides no reason to dissent from the position taken by the majority of our sister Courts of Appeals.

17

(7th Cir. 2001); *United States v. Pounds*, 230 F.3d 1317, 1319 (11th Cir. 2000). We are persuaded that the express inclusion of a minimum sentence, but not a maximum sentence, indicates an intention to make life imprisonment the statutory maximum. *Cf. United States v. Williams*, 892 F.2d 296, 304 (3d Cir. 1989) (explaining that "[w]hen Congress [in 18 U.S.C. § 924(e)(1)] provided for 'imprisonment of not less than fifteen years'" for anyone convicted of violating § 922 who had previously been convicted of three violent felony offenses, "it meant a maximum of life").

Accordingly, we join our colleagues on other Courts of Appeals in holding that the maximum sentence for a § 924(c)(1)(A) conviction is life imprisonment. We thus affirm the District Court's sentence of 360 months based on the suggested Guidelines range of 360 months to life imprisonment.

\* \* \* \* \*

We thus affirm both Shabazz's conviction and sentence.